# In The United States Court of Federal Claims

No. 12-179C

(Filed: September 23, 2013)

_____

A & T SYSTEMS, INC.,

          Plaintiff,

v.

THE UNITED STATES,

          Defendant.

_____

**ORDER**

_____

Oral argument on plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment is scheduled for today at 2:00 pm. The parties shall be prepared to discuss *Appeal of Pearl Properties*, 96-1 BCA P 28219, HUDBCA No. 95-C-118-C4, 1996 WL 99364, (H.U.D.B.C.A.), March 04, 1996—a copy of which is attached.

**IT IS SO ORDERED.**

                                                  s/ Francis M. Allegra
                                                  Francis M. Allegra
                                                  Judge

C
96-1 BCA P 28219, HUDBCA No. 95-C-118-C4, 1996 WL 99364 (H.U.D.B.C.A.)

HUDBCA

Appeal of: PEARL PROPERTIES, Appellant

Contract No. 043-92-005N

March 4, 1996

For the Appellant

Shelton H. Skolnick, Esq.

Bruce J. Trimble, Esq.

Skolnick & Leishman, P.C.

18125 Azalea Drive

Derwood, Maryland 20855

For the Government

Bruce M. Kasson, Esq.

Office of General Counsel

Department of Housing and Urban Development

Washington, D.C. 20410

RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

This case is an appeal by Pearl Properties ("Appellant" or "Pearl") from a contracting officer's final decision dated January 30, 1995, denying most of Appellant's claim for final payment on a close-out invoice submitted after the expiration of a real estate asset management contract. Appellant filed an appeal from the contracting officer's final decision on February 1, 1995. On May 12, 1995, the parties filed Cross–Motions for Summary Judgment concerning three entitlement issues raised by the appeal. The parties filed a joint stipulation of facts. Each party asserts that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. The parties agree that, once the Board decides the three issues of entitlement in dispute, they will be able to resolve monetary claims.

Summary judgment is appropriate only when the material facts are undisputed and the moving party is entitled to judgment as a matter of law. The movant has the burden of demonstrating both elements. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed.Cir.1987). The parties have raised issues of contract interpretation with no material facts in dispute. Contract and regulatory interpretation is a question of law which may be resolved by summary judgment. P.J. Maffei Building Wrecking Corp. v. United States, 732 F.2d 913, 916 (Fed.Cir.1984). Summary judgment is appropriate in this case.

The first issue in dispute concerns the interpretation of Section B.2(A), Note 2, of the contract as it applies to payment for work on properties not sold when the contract expired. The second issue concerns the Government's right to offset or charge back to Appellant expenses incurred by the Government for correction of contract work after expiration of the contract when Appellant was given neither notice of the need for correction of work nor the opportunity to correct work at no additional cost to the Government. Appellant states in its motion that it does not dispute that the work needed correction, or the reasonableness of the amounts paid by the Government for the correction of the work. The third issue in dispute is whether Appellant is entitled to legal and accounting costs incurred after expiration of the contract and after Appellant had submitted a close-out invoice for payment.

FACTS NOT IN DISPUTE

1. On July 30, 1992, Pearl entered into Contract No. 043–92–005N ("contract"), an indefinite quantity contract with the U.S. Department of Housing and Urban Development ("HUD"), to supply Real Estate Asset Management ("REAM") services. Under the contract,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Pearl was required to provide specified services designated to maintain certain HUD-owned properties for eventual sale by HUD. (Appeal File ("AF") 2.1, pp. 1, 3–18.)

2. HUD did not exercise an option to renew the contract, and on July 31, 1993, the contract expired (AF 3.5).

3. On July 30, August 1, and August 4, 1993, HUD Realty Specialist James Cannon and Mary Routte, an employee of interim REAM contractor Cecil Routte Realty, performed a series of inspections on HUD properties which had been assigned to Pearl under the contract (AF 3.12, AF 4.12). Cannon and Routte found deficiencies at eight properties, and HUD ordered Cecil Routte Realty to correct these deficiencies. (AF 3.12, AF 4.12, Agreed Stipulation of Facts No. 8.)

4. Pearl was informed of the deficiencies discovered by the HUD inspections after the deficiencies were corrected by Cecil Routte Realty. (AF 3.12).

5. HUD charged Pearl with the cost of having Cecil Routte Realty correct the work not done acceptably by Pearl. HUD deducted this cost from Pearl's invoice for July 1993. (AF 3.11.)

6. Under Section B.2(A) of the contract, Pearl submitted a close-out invoice, dated October 25, 1993, for unpaid expenses on 22 unsold properties, including direct costs, an indirect cost rate of 107.72%, and a 15% "fee" for profit. (AF 3.10.) The Government requested documentation from Pearl for its costs. The Government also questioned the basis for Pearl's entitlement to some of the costs included in the close-out invoice. (AF 3.11–3.13, 3.16, 3.17.)

7. By letter dated January 15, 1994, Pearl's attorney requested a "final determination" on the close-out invoice, and stated that HUD's delay in paying the invoice had caused Pearl to incur legal and accounting costs, for which Pearl would submit a separate invoice. (AF 3.19). By letter dated March 18, 1994, the contracting officer notified Pearl that he would only authorize reimbursement of $2173.68 to Pearl, subject to Pearl providing the requested documentation. (AF 3.22.)

8. In response to continuing questions from the contracting officer and the letter dated March 18, 1994, Pearl submitted a partially revised close-out invoice on April 25, 1994. In the cover letter for the April 25, 1994 invoice, Pearl's attorney referred to both the October 25, 1993 invoice and the partially revised invoice as claims, but did not request that the contracting officer treat either invoice as a claim pursuant to FAR 33.201. Pearl withdrew its request for payment for six custodial properties and the 15% fee included in its original close-out invoice, but it added $4,205.00 for legal and accounting services, and cited to FAR 31.205–42(g)(i)(A) for allowability of those costs, which Pearl attributed to HUD's "unwarranted delay" in approving the close-out invoice. No documentation of the legal and accounting costs was included in support of that added cost item. (AF 3.25). Pearl had already been paid 30% of its fixed-price for eleven of the sixteen properties still included in its close-out invoice. It had received no payment for five of the properties listed on the invoice. (AF 3.25.)

9. By letter dated May 6, 1994, the contracting officer notified Pearl that he would authorize payment of $2,209.20, provided that Pearl produce certain documentation. The contracting officer indicated that Pearl would not be entitled to legal and accounting costs pursuant to FAR 31.205–42(g)(i)(A) because that provision applied only to contracts terminated for the convenience of the Government. (AF 3.26.)

10. On July 10, 1994, Pearl submitted a certification of a close-out claim for $18,324.35, and requested either full payment or a "final determination" from the contracting officer. The letter from Pearl's attorney that accompanied the certification of the close-out claim stated that Pearl wanted to avoid the process of a formal dispute. It also stated, in response to the contracting officer's refusal to pay Pearl's legal and accounting costs under FAR 31.205–42(g)(i)(A), that Pearl was entitled to recover those costs as "direct costs" pursuant to FAR 31.202. (AF 3.27.)

11. On January 30, 1995, the contracting officer issued a final decision on Pearl's claim, denying all but

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

$2,162.20. The contracting officer denied Pearl's request for legal and accounting costs under FAR 31.205–42 on the ground that FAR 31.205–42 only applies to contracts terminated for the convenience of the Government. He did not address Pearl's alternate legal basis for recovery of those costs as direct costs under FAR 31.202. The contracting officer offset $916.00 still in dispute for costs incurred by HUD to have Cecil Routte Realty correct Pearl's work against any amount ultimately paid to Pearl. The contracting officer denied Pearl's "other direct expenses" claim for each of the properties for lack of documentation, and effectively denied Appellant's claim for indirect costs by omitting them from the amount deemed payable without discussion of the issue. (AF 1.1.)

DISCUSSION

| First Year | $ 1094.45 |
|---|---|

This fee is payable in installments. Thirty (30) percent will be paid at the time HUD lists (advertises) the property for sale and the remaining Seventy (70) percent will be paid when the sale closes.

\* \* \*

NOTE 2: In the event properties are not sold when the contract expires or it is partially or fully terminated for the convenience of HUD, the Contractor shall be paid a negotiated amount for documented expenses. Any such partial per property payment shall not exceed the prices stated above. (AF 2.1.)

Pearl argues that "documented expenses" include all of the direct and indirect costs to which a contractor would ordinarily be entitled for acceptable performance of a contract, so long as those costs are substantiated by documentation. The Government contends that the phrase "documented expenses" in Note 2 includes only those documented "out-of-pocket" expenses for performance of contract tasks on specific properties, and that it does not include indirect costs, even if they can be documented, because they were not expenses incurred for specific properties, but for the entire contract inventory.

Under established rules of contract interpretation, an in-

I. Entitlement to Indirect Costs

The threshold question to be resolved centers on the interpretation of the language contained in contract Section B.2(A), Note 2. The parties disagree on the meaning of "documented expenses" in Note 2. The contract does not define the term. Section B.2(A), including Note 2, provides, in pertinent part, as follows:

B.2 Compensation for Required Services.
    A. As full compensation for performance of all service defined in Section C, the contractor shall be paid the following fees (fixed prices) for each HUD-owned property assigned:

terpretation which gives reasonable meaning to all parts of the instrument will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, or superfluous. Hol–Gar Manufacturing Corp. v. United States, 169 Ct.Cl. 384, 351 F.2d 972 (1965). An interpretation of a contract provision should also not achieve "a weird or whimsical result." Julius Goldman's Egg City v. United States, 697 F.2d 1051 (Fed.Cir.1983) cert. denied 646 U.S. 814.

As a general rule, the Federal Acquisition Regulations (FAR) treat the total cost of contract performance as "the sum of allowable direct and indirect costs."FAR 31.201. FAR Part 31 is to be applied as the cost principles applicable to fixed-price contracts that requires a determination or negotiation of costs, FAR 31.102, and to cost-reimbursement contracts, FAR 31.103. There is no usage of the word "expenses" in the contract or the FAR that would distinguish it from the word "cost" as used in the FAR. We therefore construe "expenses" and "cost" to be synonymous unless the result would be unreasonable in context.

The Government's construction of Note 2 automatically would deprive Appellant of expenses that it incurred as indirect costs of performance of this contract, simply because certain properties remained unsold at contract

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

expiration, even though it was HUD's duty to sell the properties, not Appellant's. The Government contends that its construction of Note 2 is both reasonable and fair to Appellant. It argues that Appellant gambled that it would not be reimbursed its cost of performance up to the fixed-price fee for properties that were unsold at the time of contract expiration, and that this financial risk was balanced by other risks that were more to Appellant's financial advantage.

We disagree with the Government's view of Appellant's risks under the contract. We doubt that Appellant knowingly assumed the risk that it could not recoup its indirect costs of performance simply because properties may not have been sold by HUD before the contract expired. This is an indefinite-quantity contract. Appellant's biggest financial risk was on the number of properties that would be in the contract inventory each month. Appellant also gambled that it might have to service an unsold property for a long time, increasing its costs of performance on that property to the point that Appellant would not even be able to recover all of its costs, let alone any profit built into its bid, because of the fixed-price ceiling per property. These are substantial, negative risks when contrasted with the possibility of getting full payment for little work if a property sold quickly.

The Government admits that the purpose of Note 2 was to provide a contractual vehicle for compensating a contractor for work that it performed on unsold properties, but its interpretation of that provision leads to a contrary result. Note 2 treats both expiration of a contract and a termination for convenience the same. The effect of a termination for convenience is to convert a fixed-price contract into a cost-reimbursement contract as to the work performed up to the effective date of the termination. Southland Manufacturing Corp., ASBCA No. 16830, 75–1 BCA ¶ 10,994.

The contract contains both fixed-price and cost-reimbursement elements. Note 2 is one of the cost-reimbursement elements of the contract. Under FAR 31.210–1, indirect costs are recoverable under a cost-reimbursement contract if allowable, reasonable, and allocable. FAR 52.216(7)(b)(ii)(E), which specifically allows for the reimbursement of allowable and allocable indirect costs, is incorporated into the contract by reference. We agree with the Government that it is applicable to both the fixed-price and cost-reimbursement elements of the contract, despite a missing asterisk which HUD used to indicate contract clauses applicable to the cost-reimbursement elements of the contract, because FAR 16.307(a) requires inclusion of the clause in contracts that provide for cost-reimbursement.

We can find no contractual basis for the Government's refusal to pay Appellant's indirect costs as unallowable under Note 2. Note 2 must not be read in a vacuum, but in conjunction with FAR 52.216–7. No provision of the contract states that indirect costs, per se, are unallowable. An accounting system can take into consideration the indirect costs of contract performance by applying an indirect cost rate to direct expenses. Indeed, FAR 52.216–7(d) contemplates such an approach. There is nothing inherently improper in Appellant's accounting method of calculating its indirect cost burden per property by applying its indirect cost rate to its direct costs per property. The Government's challenge to this accounting method appears to be its only basis for arguing that indirect costs cannot be "expenses" under Note 2 because they were not incurred for contract work on a specific property. We find the Government's position in this regard to be seriously flawed.

The more reasonable interpretation of Note 2 is to read it as encompassing both direct and indirect costs within the word "expenses." To do otherwise would deprive Appellant of part of its real and actual cost of performance, which includes its indirect costs by definition in the FAR, and would also require us to ignore the express provision in the contract of FAR 52.216–7(b)(ii)(E). To apply HUD's construction of Note 2 would lead to a "weird" result that is unacceptable, unreasonable and unfair. Peters v. U.S., 694 F.2d 687 (Fed.Cir.1982); A2C3 Partners, AGBCA No. 91–223–1, 93–1 BCA ¶ 25,500.

The Government has expressed concern that it not be made to pay Appellant "twice" for those properties for which Appellant has already received a partial payment of 30% of the fixed-price fee per property. To avoid double payment in applying these rulings on entitle-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

ment, the parties might wish to calculate Appellant's total documented allocable costs for each property, a final indirect cost rate, and then subtract any payments already received by Appellant for that property, to arrive at the amount due Appellant for each property. This method is recommended in FAR 49.203(c) for calculating termination settlement payments when partial payment has already been made, and it might prove equally useful in this circumstance.

We grant Appellant's motion for summary judgment on its entitlement to reimbursement of documented direct and indirect costs, so long as they are allowable, reasonable and allocable, up to a total payment of the fixed price per property as provided in the contract.

II. Correction of Work After Contract Expiration

The parties dispute whether the contract permits the Government to offset the cost of correction of Pearl's work by a subsequent contractor from payment due on the contract to Pearl, when Pearl was afforded no notice or opportunity to cure the deficiencies. The Government contends that FAR 52.232–1, which is incorporated into the contract by reference, only requires it to pay for services that it has accepted, and it did not accept all of Pearl's work on eight of the properties. The Government also argues that Section E.4 of the contract does not require it to ask or allow Pearl to reperform unacceptable work.

Sections E.4(d) and (e) of the contract set out the Government's rights and responsibilities concerning contract work that is not acceptable. It provides, in pertinent part, as follows:

> E.4 52.246–4 Inspection of Services—Fixed Price. (APR 1984)
> (d) If any of the services do not conform with contract requirements, the Government may require the Contractor to perform the services again in conformity with contract requirements, at no increase in contract amount. When the defects in services cannot be corrected by reperformance, the Government may (1) require the Contractor to take necessary action to ensure that future performance conforms to contract requirements and (2) reduce the contract price to reflect the reduced value of the services performed.
> (e) If the Contractor fails to promptly perform the services again or to take the necessary action to ensure future performance in conformity with contract requirements, the Government may (1) by contract or otherwise, perform the services and charge to the Contractor any cost incurred by the Government that is directly related to the performance of such service or (2) terminate the contract for default.

The Government argues that it was not required under Section E.4(d) of the contract to provide Pearl the opportunity to reperform the work found to be deficient because the word "may" is permissive in the phrase "the Government may require the Contractor to perform the services again."However, that phrase does not stand alone. If the Government chooses not to have the contractor reperform deficient work that could be corrected by reperformance, the Government forfeits its right to certain financial remedies, by the express terms of the contract.

The Government is not entitled to liquidated damages under the contract because the liquidated damages clause was deleted from the contract. FAR 52.232–1, on which the Government relies, states that the Government shall pay the contractor the prices stipulated "... for services rendered and accepted, less any deductions provided in this contract."(Emphasis added). The only contract provisions applicable to a deduction or repayment for unacceptable work are Section E.4(d) and (e). **Section** E.4(d) limits the Government's right to "reduce the contract price to reflect the reduced value of the services performed" to those circumstances when the defects in services cannot be corrected by **reperformance**. FAR 52.232–1 sets out a like limitation on the Government's right to reduce the contract price to reflect the reduced value of services performed. Similarly, under Section E.4(e) of the contract, the Government may "perform the services and charge to the Contractor any cost incurred by the Government that is directly related to the performance of such service" only if the contractor "fails to promptly perform the services again ..."

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Government chose not to ask Pearl to reperform the work that it found to be deficient. The Government did not even notify Pearl that it considered its July performance on any of the eight properties to be unacceptable until after the interim REAM contractor had already corrected it. It is unclear why the interim REAM contractor received any special compensation for work done on these properties if they were still part of the contract inventory. In any event, we need not solve that puzzle to rule on these motions because the legal rights of the parties were fixed at the time that the Government decided not to ask Pearl to reperform. By the terms of Section E.4(d) and (e) of the contract, the Government may not recover from Pearl the costs for the correction of the work because it did not first ask Pearl to reperform. It also waived any right that it may have had under Section E.4(d) or FAR 52.232–1 to reduce Pearl's payment by failing to first seek correction from Pearl.

The Government objects to this result, claiming that it unjustly enriches Pearl and makes the Government pay twice for the same work. The contract sets out the simple measure by which the Government could have protected itself from this "unfair" result, yet the Government chose not to avail itself of that process. Any resulting "unfairness" is attributable to the Government's election not to notify Pearl of any unacceptable work until after it had been corrected by another contractor and its election not to ask Pearl to reperform it. Furthermore, any payment inequity that may flow from the Government's election does not alter the basic contractual rights and obligations of the parties under Section E.4(d) and (e) of the contract.

Therefore, we grant Appellant's motion for summary judgment on this issue because the Government has no right under the contract to offset or charge back to Appellant the costs of correction of work that the Government did not first ask Appellant to correct at no additional cost to the Government.

### III. Legal and Accounting Costs

Under FAR 31.202, costs identified specifically with a contract are direct costs of the contract. Included within Appellant's claim for "total direct expenses" are $4,205.00 in legal and accounting costs. Although we can find no documentation of these expenses in the Appeal File, the issue raised by the motions currently before us is not one of documentation, but of entitlement. Legal and accounting costs are generally allowable costs if they are identified with contract performance or contract administration. Bill Strong Enterprises, Inc. v. Shannon, 49 F.3d 1541 (Fed.Cir.1995); FAR 31.205–33(b). However, they are not allowable costs if they were incurred for prosecution of a claim against the Government. FAR 31.205–47(f)(1).

The United States Court of Appeals for the Federal Circuit, in Strong v. Shannon, supra, sets out the basic rules to be followed in distinguishing between allowable legal and accounting costs of contract administration and unallowable costs of claim prosecution. The Court of Appeals stated that it is immaterial whether these costs are incurred before or after contract performance. So long as they were incurred either in connection with the contract work itself or in administration of the contract, they are allowable direct costs. Costs incurred to litigate a claim are not allowable. The reasons why the contractor incurred professional services costs, not when they were incurred, will determine whether such costs are allowable. Ibid. Although the Court of Appeals was interpreting the 1987 version of the FAR, and this case arises under the 1989 version of the FAR, the principles stated by it are applicable because they address cost principles that were not changed by the 1989 revision.

We note that the Court of Appeals' subsequent decision in Reflectone, Inc. v. Dalton, 60 F.3d 1572 (1995), limited to some extent its ruling in Strong v. Shannon, by holding that a written demand seeking payment as a matter of right of a sum certain is a claim for purposes of both Contract Disputes Act jurisdiction and FAR 33.201, so long as that demand is "non-routine." Once there is a claim, legal and accounting costs incurred thereafter are presumed to have been incurred to prosecute the claim, even if negotiations are the form that prosecution takes, and are not allowable costs. Betancourt & Gonzalez, S.E., DOTCAB Nos. 2785, 2789, 2799,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

—— BCA ¶ —— (October 30, 1995). The Court of Appeals held in Reflectone, supra, that a request for an equitable adjustment is non-routine, and that it immediately becomes a claim upon filing. However, FAR 33.201 defines an invoice that is not in dispute when submitted as a routine request for payment. FAR 33.201 further provides that an invoice which is not in dispute when submitted is not converted to a claim until the contractor gives written notice to the contracting officer of its conversion because it is "disputed either as to liability or amount, or is not acted upon in a reasonable time."

This is a case of first impression of the relationship of the holdings in Strong v. Shannon, Reflectone, and FAR 33.201 in the context of an invoice that becomes disputed after its initial submission, but the contractor does not make clear when it is converting the invoice to a claim under FAR 33.201. Under the facts of this case, the close-out invoice was not in dispute when Pearl submitted it on October 25, 1993. Therefore, it was not a claim on October 25, 1993, as defined in FAR 33.201. Pearl apparently incurred legal and accounting costs between late October, 1993, after it submitted its initial close-out invoice, and April 25, 1994, when it submitted its revised close-out invoice. The Government was put on notice by the letter from Pearl's attorney dated January 15, 1994, that Pearl was going to submit an invoice for payment of legal and accounting costs. In that letter, the attorney attributed the reason why Pearl incurred those costs to Government delay in paying the close-out invoice.

Based on the correspondence in the Appeal File covering the time period from late October, 1993 to April, 1994, it appears that Pearl was primarily attempting to satisfy the contracting officer's concerns about its close-out invoice. During that period, Pearl revised its close-out invoice in response to continuing questions raised by the contracting officer, and also attempted to explain the legal basis for those costs that the contracting officer indicated an unwillingness to pay. Pearl did not increase its legal and accounting cost request at any time after April, 1994, even though its attorney played an increasingly active role in responding to the contracting officer after that date, as the dispute crystallized.

These undisputed facts, as they apply to the limited time period for which Pearl claims legal and accounting costs, present a pattern most consistent with written negotiations on various elements of Pearl's close-out invoice, rather than conversion and prosecution of that invoice as a claim, even though the written responses from Pearl's attorney tended to also include demands for payment, and even accused the contracting officer of causing Pearl's legal and accounting costs by delaying approval of the close-out invoice. Under the express terms of Section B.2(A), Note 2, the parties were to negotiate the close-out payment, and the documentary evidence supports a conclusion that they were trying to do so, albeit with little success.

Pearl's attorney does not appear to have altered this negotiatory position until July 10, 1994, when he certified Pearl's close-out claim. Even though Pearl did not have to certify its claim because the amount in dispute was less than $50,000, the fact of the certification is the clearest indication of when Pearl intended to convert its now-disputed close-out invoice into a claim for purposes of FAR 33.201. During all of the preceding months, Pearl never asked either this Board or the contracting officer to treat its invoice as a claim submitted for a final decision pursuant to the Contract Disputes Act. FAR 33.201 leaves it to the contractor to decide when it wants to convert a routine invoice to a claim, provided that the invoice is in dispute as to entitlement or amount, or if the contracting officer has not acted upon it within a reasonable time. The certification and demand for a decision on July 10, 1994, constitute the necessary indicia of such a conversion, even if no express reference was made by Pearl to FAR 33.201.

In Strong v. Shannon, the Court of Appeals held that costs for professional services that a contractor incurs to satisfy a contracting officer's requests for more information or documentation benefit the Government as well as the contractor by increasing the likelihood of settlement; thus, they are allowable direct costs of contract administration. Clarification by the contractor of the legal basis for its request also increases the likelihood of settlement, rather than litigation. By this reasoning,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

the legal and accounting expenses claimed by Pearl, to the extent that they were incurred in furtherance of providing information and clarification of the legal basis for its requested costs, would fall within the category of direct costs of contract administration that the Court of Appeals deems allowable.

We grant Pearl's Motion for Summary Judgment on its entitlement to the legal and accounting costs requested in its revised invoice of April 25, 1994, as direct costs of contract administration, to the extent that those costs can be documented as having been incurred in furtherance of providing to the contracting officer additional information and clarification of the legal basis for Pearl's close-out cost request. The Government's Motion for Summary Judgment on this issue is denied.

## CONCLUSION

For the foregoing reasons, Appellant's Motion for Summary Judgment on entitlement is GRANTED. The Government's Motion for Summary Judgment is DENIED.

Jean S. Cooper

Administrative Judge

Concur:
David T. Anderson

Administrative Judge

Barclay Van Doren [FNa1]

Administrative Judge

I certify, this 4th day of March, 1996, that the foregoing is a true copy of the ruling on cross-motions for summary judgment of the HUD Board of Contract Appeals in HUDBCA No. 95–C–118–C4, Appeal of Pearl Properties.

Ella B. Harrison

Recorder

FNa1 Sitting by temporary appointment

96-1 BCA P 28219, HUDBCA No. 95-C-118-C4, 1996 WL 99364 (H.U.D.B.C.A.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.